UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

BILL A. DANLEY,                    )
                                   ) No. CV-10-0284-JPH
          Plaintiff,               )
                                   ) ORDER GRANTING DEFENDANT'S
v.                                 ) MOTION FOR SUMMARY JUDGMENT
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
          Defendant.               )
                                   )
                                   )

BEFORE THE COURT are cross-motions for summary judgment noted
for hearing without oral argument on November 18, 2011. (ECF No.
17, 19). Attorney Maureen J. Rosette represents the Plaintiff,
Mr. Bill A. Danley; Special Assistant United States Attorney
Richard M. Rodriguez represents the Commissioner of Social
Security, Mr. Michael J. Astrue ("Commissioner"). The parties have
consented to proceed before a magistrate judge. (ECF No. 7).
After reviewing the administrative record and the briefs filed by
the parties, the court **grants** Defendant's Motion for Summary
Judgment (ECF No. 19) and **denies** Plaintiff's Motion for Summary
Judgment (ECF No. 17).

### JURISDICTION

Mr. Danley filed an application for disability insurance
benefits (DIB) and an application for supplemental security income
(SSI) on August 7, 2008. (Tr. 142-157). Mr. Danley alleged his

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                          - 1 -

disability began January 1, 2004 (Tr. 142-57), and later amended his onset date to May 1, 2005 (Tr. 39).  The applications were denied initially  and on reconsideration.  (Tr. 85-97).  Mr. Danley requested a hearing on April 15, 2009.  (Tr. 98-99).

At a hearing before Administrative Law Judge (ALJ) Robert S. Chester on January 21, 2010, Mr. Danley, represented by counsel; a vocational expert, Mr. Daniel R. Mckinney, Sr.; and a medical expert, Dr. Billy Allen Haynes, testified.  (Tr. 35-82, 135).  On February 12, 2010, the ALJ issued an unfavorable decision.  (Tr. 10-27).  The Appeals Council denied a request for review on July 27, 2010.  (Tr. 1-3). Therefore, the ALJ's decision became the final decision of the Commissioner, which is appealable to the district court pursuant to 42 U.S.C. § 405(g).  Mr. Danley filed this action for judicial review pursuant to 42 U.S.C. § 405(g) on August 27, 2010.  (ECF No. 4).

## STATEMENT OF FACTS

The facts have been presented in the administrative hearing transcripts, the ALJ's decision, the briefs of both Plaintiff and the Commissioner, and are summarized here.

Mr. Danley was 49 years old at the time of the ALJ's decision.  (Tr. 25, 27).  He has a GED.  (Tr. 55, 609).  Mr. Danley has past work as a lumber yard worker, molder operator, feeder, warehouse worker, material handler, punch press operator, and truck driver.  (Tr. 25, 55-58, 109).

Although Mr. Danley suffers from a variety of severe impairments (Tr. 15), of particular import is the severity of his epilepsy.  Mr. Danley's first documented seizure occurred while he was at work in December 2003.  (Tr. 433).  Since December 2003,

Mr. Danley has been seen and treated for his epilepsy, and its corresponding seizures, at no less than nine different facilities, all with different practitioners.  While under the care of each of these practitioners, Mr. Danley gave varying descriptions regarding the frequency with which he experienced seizures and complied with prescribed medications.

## SEQUENTIAL EVALUATION PROCESS

The Social Security Act (the "Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Act also provides a Plaintiff shall be determined to be under a disability only if any impairments are of such severity that a plaintiff is not only unable to do previous work but cannot, considering plaintiff's age, education and work experiences, engage in any other substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  Thus, the definition of disability consists of both medical and vocational components. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920.  Step one determines if the person is engaged in substantial gainful activities.  If so, benefits are denied.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If not, the decision maker proceeds to step two, which determines

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                    - 3 -

whether plaintiff has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If plaintiff does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares plaintiff's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); 20 C.F.R. § 404 Subpt. P App. 1. If the impairment meets or equals one of the listed impairments, plaintiff is conclusively presumed to be disabled. If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents plaintiff from performing work which was performed in the past. If a plaintiff is able to perform previous work, that Plaintiff is deemed not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At this step, plaintiff's residual functional capacity ("RFC") assessment is considered. If plaintiff cannot perform this work, the fifth and final step in the process determines whether plaintiff is able to perform other work in the national economy in view of plaintiff's residual functional capacity, age, education and past work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Bowen v. Yuckert*, 482 U.S. 137 (1987).

The initial burden of proof rests upon the plaintiff to establish a *prima facie* case of entitlement to disability benefits. *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971);

1  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).  The initial

2  burden is met once the plaintiff establishes a physical or mental

3  impairment prevents the performance of previous work.  The burden

4  then shifts, at step five, to the Commissioner to show: (1)

5  plaintiff can perform other substantial gainful activity and (2) a

6  "significant number of jobs exist in the national economy" which

7  plaintiff can perform.  *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th

8  Cir. 1984).

9  <center>**STANDARD OF REVIEW**</center>

10      Congress has provided a limited scope of judicial review of a

11  Commissioner's decision.  42 U.S.C. § 405(g).  A Court must uphold

12  the Commissioner's decision, made through an ALJ, when the

13  determination is not based on legal error and is supported by

14  substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995

15  (9th Cir. 1985); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir.

16  1999).  "The [Commissioner's] determination that a plaintiff is

17  not disabled will be upheld if the findings of fact are supported

18  by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572

19  (9th Cir. 1983) (*citing* 42 U.S.C. § 405(g)).  Substantial evidence

20  is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d

21  1112, 1119 n. 10 (9th Cir. 1975), but less than a preponderance.

22  *McAllister v. Sullivan*, 888 F.2d 599, 601-602 (9th Cir. 1989);

23  *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d

24  573, 576 (9th Cir. 1988).  Substantial evidence "means such

25  evidence as a reasonable mind might accept as adequate to support

26  a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

27  (citations omitted).  "[S]uch inferences and conclusions as the

28  [Commissioner] may reasonably draw from the evidence" will also be

upheld. *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965).  On
review, the Court considers the record as a whole, not just the
evidence supporting the decision of the Commissioner. *Weetman v.
Sullivan,* 877 F.2d 20, 22 (9th Cir. 1989) (*quoting Kornock v.
Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not this Court, to
resolve conflicts in evidence. *Richardson,* 402 U.S. at 400.  If
evidence supports more than one rational interpretation, the Court
may not substitute its judgment for that of the Commissioner.
*Tackett*, 180 F.3d at 1097; *Allen v. Heckler*, 749 F.2d 577, 579
(9th Cir. 1984).  Nevertheless, a decision supported by
substantial evidence will still be set aside if the proper legal
standards were not applied in weighing the evidence and making the
decision. *Brawner v. Secretary of Health and Human Services*, 839
F.2d 432, 433 (9th Cir. 1987).  Thus, if there is substantial
evidence to support the administrative findings, or if there is
conflicting evidence that will support a finding of either
disability or nondisability, the finding of the Commissioner is
conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir.
1987).

**ALJ'S FINDINGS**

At the outset, the ALJ found Mr. Danley met the insured
status requirements of the Social Security Act through September
30, 2006. (Tr. 15).  At step one, the ALJ found Mr. Danley had
not engaged in any substantial gainful activity since May 1, 2005,
Mr. Danley's amended onset date. (Tr. 15).  At step two, the ALJ
found Mr. Danley suffers from the following severe impairments:
status-post cervical fusion and diskectomy, status-post carpal

tunnel release surgery, hepatitis C, degenerative disk disease, sleep apnea, headaches, hypoglycemia, hypertension, depressive disorder, erosive gastritis, cervical dystonia, post-traumatic epilepsy, and obesity.  (Tr. 15).

At step three, the ALJ determined, although Mr. Danley suffers from severe impairments, Mr. Danley's impairments do not alone or in combination meet or medically equal a Listing impairment.  (Tr. 16).  The ALJ considered the following Listings: 1.04 (Disorders of the Spine); 11.00 (Neurological); 14.00 (Immune System Disorder); 4.00 (Cardiovascular); 3.10 (Sleep-related Breathing Disorders); and 5.00 (Digestive).  (Tr. 16).  Regarding Mr. Danley's disability under Listing 11.00, the ALJ discussed Mr. Danley's medical history and the testimony of the medical expert, Dr. Haynes.  (Tr. 17).  The ALJ specifically discussed the requirement under Listing 11.00 that the plaintiff must have epileptic seizures more than once a month despite at least three months of compliance with prescribed anti-epileptic treatment. (Tr. 16; 20 C.F.R. Pt. 404, Subpt. P App. 1, §11.02, §11.03). Regarding this requirement, the ALJ noted Mr. Danley's medical records indicate compliance with his anti-epileptic medication was a re-occurring problem. (Tr. 17).  Alternatively, the ALJ noted Mr. Danley's medical records indicate his seizures occur with less frequency than the Listing requires.  (Tr. 17).  Finally, the ALJ found Mr. Danley less than completely credible because his testimony and reports to medical sources regarding the frequency of his seizures and compliance with his prescribed medication contradicted one another.  (Tr. 17).

In anticipation of step four, relying on the VE and analyzing

all of Mr. Danley's medical conditions, the ALJ found Mr. Danley
has the residual functional capacity to perform light work.  (Tr.
19-24).  At step four, the ALJ found Mr. Danley was unable to
perform any past relevant work.  (Tr. 25).  At step five, relying
on the VE and analyzing Mr. Danley's age, education, work
experience and residual functional capacity, the ALJ determined
there are jobs that exist in significant numbers in the both
national and regional economies that Mr. Danley can perform.  (Tr.
24).  Accordingly, the ALJ found Mr. Danley is not disabled as
defined by the Social Security Act.  (Tr. 24).

<div align="center">**ISSUES**</div>

Mr. Danley alleges the ALJ erred on step three of the
sequential evaluation process when he determined Mr. Danley did
not meet the requirements of Listing 11.02 or 11.03 for epilepsy.
(ECF No. at 10-18).  Alternatively, Mr. Danley alleges the ALJ
erred in step five of the sequential evaluation process when he
determined Mr. Danley could perform work that exists in the
national economy.  (ECF No. 18 at 10-18).  In support of these
contentions, Mr. Danley alleges the ALJ erred when he weighed the
opinions of Mr. Danley's 'treating sources' and when he assessed
Mr. Danley's credibility.  (ECF No. 18 at 10-18).   In response,
the Commissioner asserts the Court should affirm the ALJ's
decision because it applied correct legal standards and is
supported by substantial evidence.  (ECF No. 20 at 2).

<div align="center">**DISCUSSION**</div>

In social security proceedings, the claimant must prove the
existence of a physical or mental impairment by providing medical
evidence consisting of signs, symptoms, and laboratory findings;

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                          - 8 -

the claimant's own statement of symptoms alone will not suffice. 20 C.F.R. § 416.908.  Sources who can provide the underlying evidence to establish an impairment are limited.  20 C.F.R. § 416.913.  Acceptable medical sources are: licensed physicians; licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists. 20 C.F.R. § 416.913(a)(1-5).  One form of medical evidence that can contribute to proving the existence of a physical or mental impairment is a medical opinion.  Medical opinions are statements from physicians, psychologists or other acceptable medical sources that reflect judgments about the nature and severity of the claimant's impairment(s), including the claimant's symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s), and the claimant's physical or mental restrictions. 20 C.F.R. § 404.1527.

A treating physician's medical opinion is given special weight because of familiarity with the claimant and the claimant's physical condition. *Fair v. Bowen*, 885 F.2d 597, 604-05 (9th Cir. 1989).  A treating physician's opinion is not "necessarily conclusive as to either a physical condition or the ultimate issue of disability." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citations omitted).  More weight is given to a treating physician than an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Correspondingly, more weight is given to the opinions of treating and examining physicians than to nonexamining physicians. *Benecke v. Barnhart*, 379 F.3d 587, 592 (9th Cir. 2004).  If the treating or examining physician's opinions are not contradicted, they can be rejected only with

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                    - 9 -

clear and convincing reasons.  *Lester*, 81 F. 3d at 830. If contradicted, the ALJ may reject an opinion if he states specific, legitimate reasons that are supported by substantial evidence. See *Flaten v. Secretary of Health and Human Serv.*, 44 F.3d 1435, 1463 (9th Cir. 1995).

In addition to the testimony of a nonexamining medical advisor, the ALJ must have other evidence to support a decision to reject the opinion of a treating physician, such as laboratory test results, contrary reports from examining physicians, and testimony from the claimant that was inconsistent with the treating physician's opinion.  *Magallanes v. Bowen*, 881 F.2d 747, 751-52 (9th Cir. 1989); *Andrews v. Shalala*, 53 F.3d 1042-43 (9th Cir. 1995).  Finally, in addition to evidence from the aforementioned acceptable medical sources, a claimant may also use evidence from other sources to show the severity of his or her impairment(s) and how it affects the claimant's ability to work. 20 C.F.R. § 416.913(d).  Others sources include, but are not limited to, nurse-practitioners, physicians' assistants, chiropractors, and therapists.  20 C.F.R. § 416.913(d).  Non-accepted medical source opinions are treated like lay opinions. *See Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The ALJ may either reject or give less weight to lay opinions if he or she gives reasons germane for doing so.  *Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).

**A. Listing for Epilepsy (11.02 or 11.03)**

Mr. Danley alleges the ALJ erred on step three of the sequential evaluation process when he determined Mr. Danley did not meet the requirements of Listing 11.02 or 11.03 for epilepsy.

(ECF No. 18 at 10-18).  Specifically, Mr. Danley alleges the ALJ erred by failing to properly weigh the opinions of his treating sources from Rockwood Neurology: Dr. Powell and Amy Gregg PA-C. (ECF No. 18 at 12, 1-2; at 14, 17-19).  Mr. Danley asserts both Dr. Powell and Ms. Gregg are treating sources whose medical opinions are entitled to controlling weight.  Hence, the ALJ erred by not "set[ting] forth the requisite reasons for rejecting Mr. Danley's treating physician's opinions." *Id*.  Additionally, Mr. Danley asserts the ALJ erred when assessing Mr. Danley's credibility and correspondingly not giving substantial weight to Mr. Danley's own testimony regarding the frequency and severity of his seizures.  (ECF No. 18 at 10-18).

In order to meet the requirements of Listing 11.02, the plaintiff must have epileptic seizures more than once a month despite at least three months of compliance with prescribed anti-epileptic treatment. (Tr. 16; 20 C.F.R. Pt. 404, Subpt. P App. 1, §11.02, §11.03). According to social security regulations, adherence to prescribed anti-epileptic therapy can ordinarily be determined from objective clinical findings: "Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance." 20 C.F.R. Pt. 404, Subpt. P App. 1 §11.00(a).

In Mr. Danley's case, the ALJ based his opinion regarding whether Mr. Danley met or medically equaled Listing 11.02 and 11.03 on two separate grounds: first, Mr. Danley has not complied with prescribed anti-epileptic treatment; and, alternatively, Mr. Danley's seizures do not occur with the requisite frequency.  (Tr. 16).  Regarding weighing opinion evidence, the ALJ stated he

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                              - 11 -

"assigned significant weight to acceptable medical sources opinions while discounting non-accepted medical opinions where appropriate." (Tr. 25).

I. Compliance with prescribed seizure medications

Mr. Danley contends he has been sufficiently compliant with his medications so as to meet the requirements of Listing 11.02. In support of this Mr. Danley primarily points to a post administrative hearing letter from Ms. Gregg dated January 29, 2010. (ECF No. 18 at 12-16; Tr. 892). This letter was submitted as evidence by Mr. Danley's attorney sometime between February 2, 2010, and when the ALJ issued his opinion on February 12, 2010. (Tr. 27, 892). In this letter, Ms. Gregg states the "best [she] can tell from reviewing his records" Mr. Danley "appears to have approximately one seizure per month while on Depakote", and he "seems to have been" compliant with his medications since August 2009. (Tr. 892).

Mr. Danley contends Ms. Gregg is a treating source whose medical opinion in the January 29, 2010, letter regarding his recent compliance with prescribed medications is entitled to controlling weight. Mr. Danley correctly points out that nowhere in the ALJ's opinion is the January 29, 2010, letter from Ms. Gregg noted or otherwise directly addressed. For this reason, Mr. Danley concludes the ALJ did not "set forth the requisite reasons for rejecting Mr. Danley's treating physician's opinions" and the decision must be reversed (ECF No. 18 at 12, 1-2).

*a. Ms. Amy Gregg PA-C as a "treating source"*

As stated above, the Code of Federal Regulations distinguishes between those opinions coming from "acceptable

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                      - 12 -

medical sources" and those coming from "other sources."  20 C.F.R.
§§ 404.1527, 416.913.  Likewise, the Code of Federal Regulations
permits the ALJ to accord opinions from other sources less weight
than opinions from acceptable medical sources.  *Id.*  Typically,
the opinion of a nurse practitioner is an "other source" which the
ALJ may accord less weight than acceptable medical sources.  20
C.F.R. § 416.913. However, the opinion of a nurse practitioner may
constitute a treating source when a nurse practitioner works so
closely with a treating physician that the nurse practitioner is
merely acting as the agent of that treating physician.  *Gomez v.*
*Chater*, 74 F.3d 967 (9th Cir. 1996) (holding an ALJ was entitled to
give controlling weight to the opinion of a treating nurse
practitioner who worked closely under the supervision of a
treating physician).[1]

The January 29, 2010, letter from Nurse Practitioner Amy
Gregg is not entitled to controlling weight because Ms. Gregg was
not acting as an agent of Dr. Powell.  Nowhere in the January 29,
2010, letter does Ms. Gregg mention Dr. Powell.  Actually, Ms.
Gregg qualified her assertions as her own by stating: the "best
[she] can tell from reviewing his records" Mr. Danley "appears to
have approximately one seizure per month while on Depakote", and
he "seems to have been" compliant with his medications since
August 2009 when *she* had a long discussion with Mr. Danley and *she*

---

[1]*Gomez* also states the opinion of a nurse practitioner may
constitute an acceptable medical source entitled to
controlling weight if the nurse practitioner is a member
of an interdisciplinary team. However, that exception was
grounded in 20 C.F.R. § 416.927(a)(6) and (e)(3) which
have since been deleted. See 45 Fed. Reg. 55584, as
amended at 65 Fed. Reg. 34950.

explained the severe danger noncompliance with his medication placed him in.  Hence, it is clear from the face of the January 29, 2010, letter that Ms. Gregg was not merely acting as an agent of Dr. Powell.

*b. Support for the ALJ's noncompliance determination*

As Ms. Gregg is not a treating source, it is within the discretion of the ALJ to discount her statements.  Although the ALJ did not specifically address the January 29, 2010, letter in his opinion, there are several reasons Ms. Gregg's statements regarding Mr. Danley's recent compliance with his medications were appropriately discounted.  In his opinion, the ALJ correctly noted Mr. Danley's compliance with his medication was at issue. (Tr. 16).  In support of this conclusion, the ALJ referenced and incorporated the testimony of the medical examiner and identified several instances in the record of non-compliance.

At the hearing, the medical examiner, Dr. Haynes, testified "[he] think[s] there's a lot of noncompliance." (Tr. 42).  Dr. Haynes then went on to explain Mr. Danley's neurologists "have been trying valiantly to find a medication." (Tr. 42).  However, Mr. Danley takes his medication "for a couple of days, can't stand it; next one for another couple of days, can't deal with it, etc." (Tr. 42).  Dr. Haynes also noted Mr. Danley has a history of non-compliance through overuse: "...there were a couple of hospitalizations for the Fiorinal and the Fioricet which has sedative compounds putting him into the hospital. So I just don't think that he meets the seizure listing on compliant grounds." (Tr. 43-44).  Following this statement by Dr. Haynes, the ALJ

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                    - 14 -

noted: "It looked to me like at some point the testing was showing that his Depakote in his system was a lot lower than they would have expected." (Tr. 44). Dr. Haynes confirmed the ALJ's reading of the medical record by stating: "Yeah, that, that's one way to check on compliance, and that's, that's sort of a black mark I guess you would say." (Tr. 44). Finally, when asked by Mr. Danley's attorney if Mr. Danley's seizures occurred with sufficient frequency would he meet the listing at 11.02, Dr. Haynes responded: "If that were true.. that would meet a listing. Although, I haven't seen a recent Depakote level to document that so I'd have to put a proviso in there..." (Tr. 53).

In addition to the testimony of the medical examiner, the ALJ identified a pattern of Mr. Danley's non-compliance with both his seizure medications and other medications. With regards to non-compliance with his seizure medications the ALJ made several important observations from the medical record. First, the ALJ noted "[t]wo months before the claimant's amended alleged onset date, medical sources at the Department of Corrections noted the claimant had been non-compliant in taking his anti-convulsive medication." (Tr. 20, referring to Exhibit 2F). The ALJ went on to note in August 2008, the "claimant reported that he had been previously treated with carbamazepine for seizures but stopped taking it a week earlier because he felt "spaced out." (Tr. 23, referring to Exhibit 19F). The ALJ also summarized a few of the many anti-epileptic prescriptions Mr. Danley has refused to comply with for more than a few days:

> Ms. Gregg prescribed Zonegran for his seizures, but the
> claimant returned four days later and stated that he

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                         - 15 -

could not tolerate it as it made him feel agitated and
aggressive. Ms. Gregg changed his medication to
Topamax, but the claimant informed her in January 2009
that he could not tolerate it either. Ms. Gregg opined
that the claimant needed to choose whether seizure
control or avoidance of side effects was most important
to him.

(Tr. 23, referring to Exhibit 31F) (internal citations omitted).
The ALJ concluded his review of Mr. Danley's compliance issues by
noting "[i]n August 2009, the claimant reported to Amy Gregg, PA-
C, that he had stopped taking Depakote..." (Tr. 23).

In addition, the ALJ also noted several instances of non-
compliance with other medications including: not taking prescribed
hydrocodone in June 2007; not taking prescribed anti-hypertensive
medications in July 2007; and overdosing on prescribed Fioricent
in January and May of 2007. (Tr. 21-23, referring to Exhibit 8F,
13F). Although not specifically addressed by the ALJ, this court
also notes Ms. Gregg's statement is not supported by medically
acceptable clinical and laboratory diagnostic findings or by any
significant record.

In summary, the ALJ's determination that Mr. Danley does not
meet the requirements of Listing at 11.02 because he has not been
compliant with his prescribed medications is supported by
substantial evidence. Likewise, Ms. Gregg's opinion was given
appropriate weight because it was vague, unexplained, and, most
importantly, contradicted by medical evidence.

## II. Frequency of Mr. Danley's Seizures

Alternatively, the ALJ determined "[r]egardless, the medical
records indicate that the claimant's seizures occur, at most, once
every two months. On that basis alone, his epilepsy does not meet

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                              - 16 -

or medically equal listing 11.02 or 11.03." (Tr. 16).

Accordingly, Mr. Danley simultaneously alleges the ALJ erred in

determining his seizures do not occur with the requisite frequency

under Listing 11.02. (ECF No. 18 at 12-16; Tr. 16). Similarly to

his compliance claim, Mr. Danley primarily points to the post

administrative hearing letter from Ms. Gregg dated January 29,

2010, as support for his position. (ECF No. 18 at 12-16; Tr. 892).

In relevant portion, Ms. Gregg stated: the "best [she] can tell

from reviewing his records" Mr. Danley "appears to have

approximately one seizure per month while on Depakote." (Tr. 892).

   *a. Support for the ALJ's frequency determination*

   As explained above, Ms. Gregg is not an acceptable medical

source; hence, it is within the discretion of the ALJ to discount

her statements.  Although the ALJ did not specifically address the

January 29, 2010, letter, there are several reasons Ms. Gregg's

statements regarding the frequency of Mr. Danley's seizures were

appropriately discounted.  The ALJ's determination that Mr. Danley

does not meet the requirements of Listing 11.02 because his

seizures do not occur with the requisite frequency is supported by

substantial evidence.  In support of this conclusion, the ALJ

incorporated and referenced the testimony of the medical examiner

and identified a long history of variable reporting by Mr. Danley

regarding the frequency of his seizures. (Tr. 16-26).

   Mr. Danley's medical records demonstrate he has a long

history of variable reporting regarding the frequency of his

seizures. For completeness sake, Mr. Danley's entire history of

variable reporting is documented below, with a parallel citation

following each report that indicates if and where it was noted by the ALJ in his opinion or the medical examiner in his testimony.

- December 2003: Mr. Danley's first documented seizure. (Tr. 433; Tr. 13, referring to Exhibit 5E).

- March 2005: Department of Corrections medical staff noted Mr. Danley stopped taking his prescribed medications because he "had not had a problem in 8 months." (Tr. 268; Tr. 13, referring to Exhibit 2F; Tr. 52).

- February 2007: Ms. Sandra Forsman, a nurse practitioner, noted Mr. Danley claimed his last seizure was in December 2006. (Tr. 353; Tr. 21-22 referring to Exhibit 8F).

- April 2007: Dr. Cynthia Hahn noted Mr. Danley's "seizures have been increasing in frequency, now occurring every 6 months." (Tr. 292, 294; Tr. 15, referring to Exhibit 4F).

- June 2007: Dr. Amna T. Ahmed noted Mr. Danley "states that in the last six months he has had one witnessed episode of seizure at Fred Meyer." (Tr. 512).

- November 20, 2007: Dr. Maria Janout noted "Bill states that he is 'doing alright'. He has not had any loss of consciousness or seizures since his last office visit" on October 9, 2007. (Tr. 489, 490, 492).

- February 2008: Dr. Janout noted Mr. Danley "has had no seizure episodes." (Tr. 488)

- February 2008: Ms. Forsman noted Mr. Danley had no seizure activity for the last six months. (Tr. 326; Tr. 22, referring to Exhibit 8F).

- August 2008: Staff at the Deaconess Medical Center Emergency

room noted Mr. Danley had up to four seizures, two of which were witnessed and recorded in the emergency room. (Tr. 568-574; Tr. 23, referring to Exhibit 19F).

- August 2008: Mr. Danley reported, on a seizure questionnaire, he has seizures about once every four months. (Tr. 189; Tr. 19, referring to Exhibit 5E).
- October 2008: Dr. Powell noted typically Mr. Danley has seizures once every 3-4 months, and his most recent seizure was in August 2008. (Tr. 600; Tr. 23, referring to Exhibit 22F; Tr. 46 referring to Exhibit 22F).
- November 2008: Dr. Robert Capes noted Mr. Danley's last seizure was in August of 2008. (Tr. 608; Tr. 23, referring to Exhibit 35F).
- November 2008: Ms. Amy Gregg PA-C noted Mr. Danley believes his seizures occur once every three to four months; however his fiancé believes they occur about once every two months. (Tr. 738; Tr. 13, referring to Exhibit 31F; Tr. 43-44).
- January 2009: Valley Hospital and Medical Center ER staff noted Mr. Danley has a history of seizures but has not had one since July 2008. (Tr. 730).
- January 2009: Ms. Amy Gregg PA-C noted Mr. Danley complained of an aura the night before. (Tr. 733).
- April 2009: Dr. Powell noted Mr. Danley said he had two "possible borderline seizures" per week. Mr. Danley clarified that by "borderline seizure" he meant he was flushed or confused for 10-15 minutes at a time, but never lost consciousness. (Tr. 834; Tr. 23, referring to Exhibit

40F).

- June 2009: Dr. Manek noted Mr. Danley has seizures "often, maybe once every 2 months." (Tr. 825; Tr. 44).
- July 2009: Dr. Maria Janout noted Mr. Danley reported having four seizures in the past two months. (Tr. 800; Tr. 44, referring to Exhibit 37F).
- August 2009: Amy Gregg PA-C noted Mr. Danley brought a seizure log of the last four months, in which he describes each of the four seizures.  In his seizure log, Mr. Danley suggests two of the four seizures may or may not have been a seizure and gives possible alternative explanations. (Tr. 236-238, 818; Tr. 23 referring to Exhibit 40F).
- In November 2009, Amy Gregg PA-C noted Mr. Danley had two possible seizures and one typical seizure since his last visit, but Mr. Danley felt his seizures are mild at this point and infrequent.  (Tr. 885-86; Tr. 24, referring to Exhibit 44F).
- January 29, 2010: Ms. Gregg states the "best [she] can tell from reviewing his records" Mr. Danley "appears to have approximately one seizure per month while on Depakote." (Tr. 892).

As is clear from the parallel citations provided above, almost all of Mr. Danley's extensive history of variable reporting was either directly noted by the ALJ in his opinion or incorporated by reference to the medical examiner's testimony.  Hence, Ms. Gregg's statement was appropriately discounted.

    *b. Harmless Error*

If indeed an error exists within the ALJ's opinion, it was inconsequential to the ultimate nondisability determination, and therefore harmless.  See *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050 (9th Cir. 2006); *See also Burch,* 400 F.3d at 682; *Matthews,* 10 F.3d at 681; *Curry,* 925 F.2d at 1131; *Booz,* 734 F.2d at 1379-80; *Brawner v. Sec'y of Health & Human Servs.,* 839 F.2d 432, 434 (9th Cir. 1988).  A reviewing court can consider a silent disregard of lay testimony harmless error if it can confidently conclude no reasonable ALJ, when fully crediting the evidence, could have reached a different disability determination. *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050 (9th Cir. 2006).

No reasonable ALJ, even if fully crediting the letter Ms. Gregg wrote on January 29, 2010, could have reached a different disability determination.  In order to reach a different disability determination, the ALJ would have to conclude Mr. Danley had been compliant with his medications for at least three months from August 4, 2009, to January 21, 2010, and during those same three months he had more than one seizure per month.  In addition to reaching this conclusion (in opposition to the overwhelming patterns of varying compliance and varying frequency to the contrary) the ALJ would also need to reach this conclusion despite the one piece of relevant medical evidence during this time period: a November 2009 visit with Ms. Gregg. (Tr. 885).

Regarding this visit, Ms. Gregg noted Mr. Danley was no longer taking his prescribed Gabapentin for pain because he

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                              - 21 -

claimed it made him moody. (Tr. 885). There is nothing in the

record to indicate Mr. Danley consulted with his treating

physician before he stopped taking his prescribed pain

medication. Additionally, Ms. Gregg noted Mr. Danley claims he

had two "episodes" since his last visit, in August 2009, that

seemed "a little different." (Tr. 885). When describing one of

these "episodes" Mr. Danley stated he was sitting at the kitchen

table and could no longer comprehend things for approximately

five minutes. (Tr. 885). Although Mr. Danley became

unresponsive during this time period, he remained conscious, and

walked around the house with the help of his fiancé. (Tr. 885).

There was no shaking or convulsing associated with this

"episode." (Tr. 885). Additionally, Mr. Danley reported one

typical seizure since August 2009. (Tr. 885). Ultimately, Ms.

Gregg opined:

> We discussed the balance of seizure control and side
> effects. **Depakote is the only seizure medication that
> he will allow us to use. He does not want to increase
> his dose.** He has had side effects at higher doses. I
> let him know that there are a few other medications he
> has never been on, including felbatol, phenobarbital,
> pregabalin and lacosamide. **He has no interest in
> trying other medications.** He makes a point that he is
> on a higher dose of Depakote now than he was just prior
> to his initial consultation with Dr. Powell, when he
> had multiple severe seizures. **He feels that his
> seizures are mild at this point and infrequent.** He is
> not having side effects on his current dose of
> Depakote. He is actually quite content with the way
> things are right now. Therefore no changes are being
> made.

(Tr. 886) (emphasis added).

Specifically regarding frequency, the ALJ would have to

accept Ms. Gregg's statements that the "best [she] can tell from

reviewing his records" Mr. Danley "appears to have *approximately*

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                              - 22 -

*one seizure* per month while on Depakote." (Tr. 892)(emphasis added). In addition to accepting this statement despite objective medical evidence, extensive medical records, and Ms. Gregg's own treatment records to the contrary, the ALJ would also have to liberally construe Ms. Gregg's statement. In order to satisfy Listing 11.02's frequency requirement, Mr. Danley seizures must occur "*more frequently than once a month*." By the plain reading of Listing 11.02, having "approximately one seizure per month" is not sufficient to satisfy the requirements that seizures occur "more frequently than once a month."

### III. Mr. Danley's Credibility

To further aid in weighing the conflicting medical evidence, the ALJ evaluated Mr. Danley's credibility and found him less than fully credible. (Tr. 19). Specifically, the ALJ noted Mr. Danley's testimony at the hearing that his seizures occur at least once a month and his reports to medical sources contradict one another. (Tr. 20). Mr. Danley contends the ALJ erred in not crediting Mr. Danley's own testimony regarding the frequency and severity of his seizures. (ECF No. 18 at 10-18).

Credibility determinations bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or inconsistency between a claimant's subjective complaints and diagnosed condition. *See Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005). It is the province of the ALJ to make credibility determinations. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). However, the ALJ's findings must be supported by specific cogent reasons. *Rashad v. Sullivan*, 903

F.2d 1229, 1231 (9th Cir. 1990).  Once the claimant produces
medical evidence of an underlying medical impairment, the ALJ
may not discredit testimony as to the severity of an impairment
because it is unsupported by medical evidence. *Reddick v.
Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  Absent affirmative
evidence of malingering, the ALJ's reasons for rejecting the
claimant's testimony must be "clear and convincing." *Lester v.
Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  "General findings are
insufficient: rather the ALJ must identify what testimony is not
credible and what evidence undermines the claimant's
complaints." *Lester*, 81 F.3d at 834; *Dodrill v. Shalala*, 12 F.3d
915, 918 (9th Cir. 1993).

The ALJ relied on several factors when he assessed Mr.
Danley's credibility: inconsistent statements regarding
frequency of his seizures; repeated failure to follow
recommended courses of treatment; and activities inconsistent
with the degree of impairment alleged.  (Tr. 17-25).

The ALJ's reasons are clear, convincing, and supported by
substantial evidence.  Mr. Danley has a long history of
inconsistently reporting the frequency of his seizures.  The ALJ
noted Mr. Danley "testified at the hearing that his seizures
occur at least once a month, but his testimony and reports to
medical sources contradict each other." (See above for a
complete overview of Mr. Danley's history of variable
reporting).

Likewise, Mr. Danley has an extensive history of non-
compliance with prescribed medications. The ALJ noted "[t]he

evidence indicates that his issues with medication overuse and compliance are material to the frequency of his seizures." (Tr. 24). Ultimately, the ALJ concluded "the claimant's statements concerning the intensity, persistence and limiting effect of these symptoms are not credible to the extent they are inconsistent" with the residual functional capacity assessment. (Tr. 20). In addition to Mr. Danley's noted history of noncompliance with prescribed medications, the ALJ also pointed out Mr. Danley has repeatedly not complied with physical therapy recommendations from his treating physicians. (Tr. 21-22).

Finally, the ALJ noted Mr. Danley's actions and reports to medical personnel are inconsistent with the degree of impairment alleged. The ALJ noted Mr. Danley stated in his Function Report he has no problems with personal care, prepares simple meals daily, performs light household chores such as making the bed and doing the laundry, goes fishing, mows the lawn, and drives a vehicle. (Tr. 17). The ALJ took particular issue with Mr. Danley's insistence on the frequency and severity of his seizures, yet "the claimant continues to drive." (Tr. 21).

Hence, the ALJ's reasons for finding plaintiff less than fully credible are clear, convincing, and fully supported by the record. See *Thomas v. Barnhart*, 278 F.3d 947, 958-959 (9th Cir. 2002) (proper factors include inconsistencies in plaintiff's statements, inconsistencies between statements and conduct, and extent of daily activities). Noncompliance with medical care or unexplained or inadequately explained reasons for failing to seek medical treatment also cast doubt on a claimant's

subjective complaints.  20 C.F.R. §§ 404.1530, 426.930; *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

In summary, the ALJ is responsible for reviewing the evidence and resolving conflicts or ambiguities in testimony. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  It is the role of the trier of fact, not this court, to resolve conflicts in evidence.  *Richardson*, 402 U.S. at 400.  This court has a limited role in determining whether the ALJ's decision is supported by substantial evidence and may not substitute its own judgment for that of the ALJ, even if it might justifiably have reached a different result upon de novo review.  42 U.S.C. § 405 (g).

There is no error in the ALJ's assessment of the evidence with respect to the requirements of Listing 11.02.

**B. Residual Functional Capacity**

Once the sequential analysis has reached step five, in order to support a conclusion that an individual is not disabled, the Social Security Administration must provide evidence that demonstrates other work exists in significant numbers in the national economy that the claimant can do, given the claimant's residual functional capacity.  There are two ways the ALJ can meet this burden: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines (the Grids), at 20 C.F.R. pt. 404, subpt. P, app. 2. *See Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).  In cases where the guidelines are "not fully applicable," the ALJ may meet his burden at step five by propounding to a vocations

expert a hypothetical record reflecting all of the claimant's limitations.  See *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989). The ALJ's hypothetical given to the VE will be affirmed so long as it contains all the limitations which the ALJ finds credible and supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217-18 (9th Cir. 2005); *Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989).  It is proper for the ALJ to limit a hypothetical to only those restrictions which are supported by substantial evidence in the record.  See *Magallanes,* 881 F.2d at 756-57 (9th Cir. 1989).

Mr. Danley alleges the ALJ erred in step five of the sequential evaluation process when he determined Mr. Danley could perform work that exists in the national economy.  (ECF No. 18 at 10-18).  Specifically, Mr. Danley argues the ALJ did not properly weigh the opinion of his treating physician, Dr. Powell, who noted Mr. Danley could not work at all while he was having a seizure.  (ECF No. 18 at 14, 7-16).  Furthermore, Mr. Danley states the ALJ improperly relied upon the medical hearing testimony and the RFC assessments completed by state agency evaluators: Dr. Haynes, Dr. Bailey, and Dr. Wolfe.  (ECF No. 21 at 2 at 4-6).  "Mr. Danley believes that these opinions should not have been given any weight."  (ECF No. 21 at 2, 4-6).

The ALJ properly relied on Mr. Danley's medical records, the hearing testimony of the medical examiner and the vocational expert, and the RFC assessments when determining Mr. Danley had the residual functional capacity to perform light work.  With

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                         - 27 -

1  regards to certain medical evidence, the ALJ also properly

2  weighed the opinions of accepted medical sources such as Dr.

3  Powell.  The ALJ concluded:

4      [T]he claimant has the residual functional capacity to
       perform light work as defined in 20 CRF 404.1567(b) and
5      416.967(b) except he can occasionally balance, stoop,
       kneel, crouch, crawl and climb ramps or stairs, but
6      should never climb ladders, ropes or scaffolds; he can
       perform occasional overhead reaching bilaterally; he
7      should avoid concentrated exposure to extreme cold,
       heavy vibration, and hazards such as unprotected
8      heights and moving machinery; he is limited to simple,
       one to three-step work but could perform more complex
9      work if given additional time to learn; and he would
       require a break every two hours.
10
   (Tr. 19)
11
       The ALJ's limitations are supported by substantial
12
   evidence. The ALJ's decision laid out the foundation for each
13
   restriction and the evidence within the record supporting the
14
   limitation.  (Tr. 19-25).  Of particular importance, the ALJ
15
   relied on the seizure diagnosis of Dr. Powell to craft such
16
   restrictions as avoiding "unprotected heights and moving
17
   machinery," and the psychological evaluations of Drs. Capes and
18
   Mee to limite Mr. Danley "to simple, one to three-step work but
19
   could perform more complex work if given additional time to
20
   learn; and he would require a break every two hours." (Tr. 23,
21
   referring to Exhibits 22F; Tr. 19, 20, referring to Exhibits
22
   27F, 33F).
23
       Regarding Mr. Danley's seizure limitations, the ALJ noted
24
   Mr. Danley's extensive history of inconsistent reporting and
25
   non-compliance with taking prescribed medications.  See Above.
26
   Due to that history, the ALJ decided "the claimant's statements
27
   concerning the intensity, persistence and limiting effects of
28

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT                           - 28 -

these symptoms are not credible to the extent they are

inconsistent with the above residual functional capacity." (Tr.

20). Although the ALJ discounted Mr. Danley's testimony, the

ALJ did appropriately credit Dr. Powell's opinion: "Dr. Powell

also stated that the claimant could have to tolerate his one to

two seizures per year, but noted that when he did have them, he

was completely impaired." (Tr. 23, referring to Exhibit 23F).

The ALJ's hypothetical given to the VE will be affirmed so

long as it contains all the limitations which the ALJ finds

credible and supported by substantial evidence. In support of

his position, Mr. Danley quotes the following section from the

hearing testimony of the vocational expert:

> Q:    All right. If we assume our claimant with his age,
>        education, training, experience, and background is
>        able to work at the light level as that's defined
>        in the DOT. Assume further that he's limited to
>        occasional use of ramps or stairs; can do
>        occasional balancing, stooping, kneeling,
>        crouching, and crawling. He should never use
>        ladders, ropes, or scaffolds. He can do
>        occasional overhead reaching bilaterally. He
>        should avoid concentrated exposure to extreme
>        colds, heavy vibrations, and hazards such as
>        unprotected heights, moving machinery, and the
>        like. Assume also that he's limited to simple or
>        one to three step work, or if its more detailed
>        than that, that he would require additional time
>        to learn a more complex task and that he would
>        need a break about every two hours. Would he be
>        able to perform any of that past work?
> A:    No, Your Honor.
> Q:    Would there be work in either the regional or
>        national economies for such an individual?
> A:    Well, I think that person that you described in
>        the hypothetical would be able to do light work,
>        Your Honor, principally of an unskilled nature.
>        Examples of jobs that a person with this profile
>        could perform would include assembly occupations.
>        There would be approximately, there would be
>        approximately 21,000 jobs consistent with the
>        hypothetical in the tri-state northwest region.
> Q:    That Washington, Idaho and Oregon?

A:  Yes,  Washington,  Oregon,  and  Idaho.  And
approximately 675,000 in the national economy.

(Tr. 74-75).

Q:  If we assume that our claimant was unable to tend
to his work, this is during the actual workday,
for one to two hours at unpredictable times, say
two or three times a month, would that alter your
answer?

A:  I think that inconsistency, Your Honor, would not
be tolerated by an employer in a competitive work
environment over time, and it would mean that the
injured worker, or the claimant would have access
only to sheltered or benevolent employment.

(Tr. 76).

As is evident by the detailed hypothetical posed to the
vocational expert, the ALJ included all of Mr. Danley's
limitations which are supported by substantial evidence and are
relevant to his ability to work.  Particularly, the ALJ imposed
limitations appropriate for someone who suffers from
unpredictable seizures and who is incapacitated during those
seizures.

<div align="center">CONCLUSION</div>

Having reviewed the record and the ALJ's conclusions, this
court finds the ALJ's decision is free of legal error and
supported by substantial evidence.

IT IS ORDERED:

1. Defendant's Motion for Summary Judgment (ECF No. 19) is
GRANTED.

2. Plaintiff's Motion for Summary Judgment (ECF No. 17) is
DENIED.

The District Court Executive is directed to file this
Order, provide copies to counsel for Plaintiff and Defendant,

enter judgment in favor of Defendant, and CLOSE this file.

DATED this 22nd Day of September 2011.

s/ James P. Hutton

JAMES P. HUTTON

UNITED STATES MAGISTRATE JUDGE